# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANA LOURDES VOLEK, | : | CIVIL CASE NO. |
|     Plaintiff, | : | |
| | : | |
| VS. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT | : | |
|     Defendant. | : | AUGUST 1, 2016 |

## COMPLAINT

## I.    PRELIMINARY STATEMENT

1.    This action seeks declaratory, injunctive and equitable relief; compensatory damages; and costs and attorney fees for the deprivation of the rights guaranteed to the plaintiff pursuant to the provisions of the Rehabilitation Act of 1973, as amended, Title 29 U.S.C. §§ 791 and 794, in which the plaintiff claims that the defendant discriminated against her on account of her learning disability when the defendant interfered with her efforts to obtain approval from the defendant for Protocol #Hl2-113: "Connecticut Fitness and Nutrition Clubs in Motion ("CT FANs IM"), resulting in removing the plaintiff from participation in the grant proposal, as well as refusing to extend her appointment Assistant Research Professor, Departments of Kinesiology and Extension.

2.    This action seeks declaratory, injunctive, and equitable relief, monetary and compensatory damages, and costs and attorney fees to remedy the unlawful discrimination suffered by the plaintiff when the University of Connecticut retaliated against her on account of her opposition to the disability discrimination to which she

1

had been subjected by the plaintiff's former supervisor, Michael P. O'Neill, Ph.D. (Associate Dean and Associate Director, Department of Extension), among others.

## II.   **JURISDICTION**

3.   This action arises under the provisions of the Rehabilitation Act, Title 29 U.S.C. §§ 791 and 794.

4.   Jurisdiction is invoked pursuant to Title 28 U.S.C. §1343(a)(3), and Title 28 U.S.C. §1343(a)(4).

5.   Declaratory, injunctive and equitable relief is sought pursuant to Title 28 U.S.C. §2201 and Title 28 U.S.C. §2202.

6.   Attorney fees and costs are sought pursuant to Title 29 USC § 794a.

## III.   **VENUE**

7.   This action properly lies in the United States District Court for the District of Connecticut pursuant to Title 28 U.S.C. §1391(b), since the unlawful actions took place in this district, and because the defendant is located within this district.

## IV.   **PARTIES**

8.   The plaintiff, Ana Lourdes Gómez Volek, is a citizen of the United States residing currently residing in the State of Ohio.

9.   The plaintiff possesses a Bachelor of Science degree in Kinesiology from the University of Minnesota, a Master of Science in Exercise Physiology from The Pennsylvania State University, and a Doctorate in Exercise Science from the University of Connecticut.

10.   The plaintiff suffers from a disability that substantially limits various of her major life activities, including learning, reading, concentrating, thinking, and communicating.

11.  The defendant is a political subdivision of the State of Connecticut.

12.  Title 29 U.S.C. § 794 provides, in relevant part, "[n]o otherwise qualified individual with a disability in the United States, as defined in section 7(20) [29 USCS § 705(20)], shall, solely by reason of his or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…"

13.  The defendant is the recipient of Federal financial assistance.

14.  Title 29 U.S.C. § 794 further provides, in relevant part, "[f]or the purposes of this section, the term "program or activity" means all of the operations of--(1) (A) a department, agency, special purpose district, or other instrumentality of a State or of a local government."

**V.   STATEMENT OF FACTS**

15.  From 2007 through 2014, the plaintiff had been employed by the defendant as an Assistant Research Professor and Research Scientist.

16.  During her employment with the defendant, the plaintiff had been a member of both the Department of Kinesiology and the Department of Extension at the University of Connecticut ("UCONN").

17.  During most of the period when the plaintiff was a victim of the defendant's unlawful disability discrimination, and retaliation, the plaintiff was pregnant and gave birth to a child on September 28, 2013.

18.  On April 8, 2013, the plaintiff submitted an application to the Institutional Review Board ("lRB") of UCONN to review Protocol #Hl2-113: "Connecticut Fitness and Nutrition Clubs in Motion ("CT FANs IM").

19.     The project was developed to assist with preventing childhood obesity and was supported by the Agriculture and Food Research Initiative Competitive Grant Award from the USDA National Institute of Food and Agriculture.

20.     According to the parameters of the plaintiff's initial grant application, the project was required to be an integrated undertaking between her two departments.

21.     The plaintiff and Umekia Taylor ("Taylor") were Principal Investigators (co-PI's) on the CT FANs IM project.

22.     The plaintiff had received positive feedback from the federal government when the proposed protocol was submitted to obtain the grant funding.

23.     By the spring of 2013, the IRB's approval was required in order to move forward with the project.

24.     Martha Stemberg-Ennis, M.D. was the primary reviewer of the protocol, and Deborah Dillon McDonald, RN, Ph.D. was the IRB Chair.

25.     On April 25, 2013, the IRB reviewed the application for approval of the research protocol.

26.     On April 29, 2013, the IRB issued a memorandum to the plaintiff and Taylor deferring its decision on the submission because it wrongly claimed that the protocol continued to contain insufficient information and required further clarification.

27.     The plaintiff and Taylor revised the application materials and resubmitted their protocol for review by the IRB on May 28, 2013.

28.     In preparation for the upcoming IRB meeting, the plaintiff met with Nancy Wallach (Director of Research Compliance for the IRB) on June 11, 2013, to discuss some concerns regarding the protocol (specifically regarding the use of the "DXA"

4

radiation testing and the feasibility of collecting data from the anticipated community of participants).

29. On June 13, 2013, the plaintiff appeared with Brittanie Volk, MA, RD (former Ph.D. graduate fellow) at the IRB meeting.

30. Dr. Brittanie Volk ("Volk") worked as graduate student and research assistant under the plaintiff's direction on the original 4-H FANs CYFAR grant.

31.  Volk was serving as a witness and another note taker.

32. As a result of her learning disability, it was essential for the plaintiff to have another note taker assisting her.

33. The defendant immediately attempted to interfere with the presence of a note taker to assist the plaintiff by claiming that there was a lack of physical space for Volk in the meeting room.

34.  Upon the arrival of the plaintiff and Volk into the room, Wallach stated that she was not aware that the plaintiff would be accompanied by a guest.

35. Wallach's comment was stated in a most intimidating tone.

36. The plaintiff reminded Wallach that she had previously informed Wallach that she was bringing another person with her to the June 11, 2013, meeting.

37. Wallach persisted in her intimidation by claiming that there was no place in the meeting room for Volk to sit.

38. Volk retorted that she would stand during the presentation.

39. Reluctantly, room was made for Volk to sit next to the plaintiff during the presentation.

40.     At the June 11, 2013, meeting, Sternberg-Ennis (the Primary Reviewer of the protocol submission) described her clinical experience and how she had concerns about the pregnancy test component of the proposal, and the need to use of DXA in minors.

41.     Sternberg-Ennis was very condescending in her tone as she described working with minors clinically and how hard it was to tell a minor that she had tested positive to a pregnancy test.

42.     On more than one occasion Sternberg-Ennis stated during the meeting that the plaintiff had no clinical experience.

43.     Sternberg-Ennis displayed hostility toward the plaintiff as she repeatedly continued to emphasize to the IRB that the plaintiff lacked clinical experience.

44.     Clinical experience was not relevant to the review by the IRB of the plaintiff's proposal, but was raised by Sternberg-Ennis to intimidate the plaintiff.

45.     The plaintiff, in an effort to defuse Sternberg-Ennis' hostility, acknowledged that her experience was not in a clinical setting but in a research setting.

46.     The plaintiff emphasized that she possessed over seventeen years of research experience with community-based, clinical and/or work place obesity prevention interventions, which experience was far more relevant than clinical experience.

47.     The plaintiff further described her extensive experience working with multidisciplinary teams; her record of garnering extramural research support as well as her success in explaining the "science" and gaining the trust of the participants/parents/community members.

48.   After the meeting, the IRB falsely claimed that the plaintiff had failed to adequately answer questions posed during the meeting.

49.   Any inadequacy in the understanding of the members of the IRB of the plaintiff's responses to their questions was the result of intentional disability discrimination directed at the plaintiff by various members of the IRB.

50.    The disruptive behavior of certain members of the IRB, who were aware of the plaintiff's learning disability, created difficulty for the plaintiff in responding to the questions posed to her at the IRB session.

51.   The members of the IRB failed to alert the plaintiff to the claimed inadequacy of her responses and, by their behavior, intentionally interfered with her ability to address the questions posed to her at the meeting.

52.   Nevertheless, the issues raised by the IRB were baseless, employed by the IRB to discriminate against the plaintiff on the basis of her learning disability.

53.   Various members of the IRB were aware of the plaintiff's learning disability, and intentionally created a disruptive environment to interfere with the plaintiff's presentation to the IRB.

54.   Even though the defendant asserts that the IRB had legitimate concerns about the plaintiff's responses, the IRB failed to seek clarification at the meeting of the plaintiff's responses, or further explanation on the topics subsequently raised by its members.

55.   The questions directed at the plaintiff at the IRB review, should have, in the very least, been restated, particularly in view of the fact that Jaci Van Heest, Ph.D., a member of the IRB, was fully aware that the plaintiff suffered from a learning

disability that could substantially impact on her understanding of, and her ability to, answer questions posed by members of the IRB.

56. During the plaintiff's presentation at the June 13, 2013, IRB meeting, members of the IRB demonstrated disability discrimination in the undignified, uncivil, impolite, and discourteous manner in which they treated the plaintiff.

57. In particular, Dr. Van Heest was extremely rude in addressing the plaintiff, resorting to ridicule by demonstrably rolling her eyes, slamming a pencil on her desk and loudly talking with other IRB members while the plaintiff was attempting to make her presentation.

58. In addition, Dr. Stemberg-Ennis, the primary reviewer of the submission, was dismissive, and most contemptuous, and adversarial in her behavior toward the plaintiff.

59. Dr. Van Heest was aware of the plaintiff's learning disability since she had previously received academic accommodations based on a disability when she was a doctoral candidate working with Dr. Van Heest.

60. Disregarding the discriminatory conduct of the IRB, the plaintiff persisted in her efforts to gain approval for their proposal, and submitted a revised proposal to the IRB on June 14, 2013.

61. Once again the IRB deferred its decision on whether to approve the proposal, claiming that it had reviewed the revised application, and found that the protocol continued to contain insufficient information and required further clarification.

62.    The plaintiff, Taylor, and Jeffery M. Anderson, M.D.("Anderson"), again revised their application materials and resubmitted their protocol for review by the IRB on July 17, 2013.

63.    Anderson was the medical monitor on all protocols that involved the Department of Kinesiology (Human Performance Laboratory) as well as a former member of the IRB committee.

64.    While the plaintiff collaborated with Anderson on revisions to the IRB comments, he stated on more than one occasion that several IRB members, specifically Sternburg-Ennis and Van Heest, knew the risk of doing DXA scans was very low, and not a legitimate reason for refusing to approve the grant protocol.

65.    The defendant raised safety concerns over the use of the DXA scans as a pretext to cover up the disability discriminatory behavior directed at the plaintiff in refusing to approve the protocol.

66.    The IRB reviewed the second revised protocol application on August 1, 2013.

67.    On August 2, 2013, the IRB disapproved the revised submission, falsely stating that "one or more of the elements required for approval has not been met, and in the Board's opinion, cannot be satisfied through revisions to the application."

68.    Specifically, the IRB erroneously claimed that the requirement that the protocol constituted "research" was not met.

69.    In spite of conclusive scientific proof as to the safety of radiation testing on the subjects (DXA), the IRB raised specious concerns about it being a component of the protocol.

70.     The IRB disapproval letter stated "HPL testing portion of this project does not include stated research questions or goals."

71.     The statement that "HPL testing portion of this project does not include stated research questions or goals," was false; the plaintiff had included stated research questions and goals (multiple times in various formats – written, logic model etc.).

72.      The protocol as originally authored by the plaintiff was inappropriately changed by the IRB committee in the proposed questions it directed to the plaintiff.

73.     The plaintiff was being asked about items she had not written or included in the protocol.

74.     These questions were presented to the plaintiff as though she had written the protocol to include a measures which she never presented in any of her written or verbal communications or documentation.

75.     The IRB treated the plaintiff significantly different from other non-disabled researchers who had submitted proposals to it.

76.     On August 7, 2013, the plaintiff had a phone conference with her administrative supervisors and Taylor regarding the discriminatory treatment to which she was subjected by IRB, and its members.

77.     On the call were Larry Armstrong, Ph.D., Interim Kinesiology Department Head, Cameron Faustman, Ph.D., Associate Dean of Academic Programs of CANR, Michael O'Neill, Ph.D., Associate Director, Extension, and Umekia Taylor, M.S.

78.     On August 12, 2013, the plaintiff met with O'Neill to complain personally to him about the disability discrimination, harassment, and hostility directed at her by the IRB.

79.   The plaintiff presented O'Neill with a draft letter addressed to the defendant's Vice President of Research, Jeff Seemann, Ph.D., that she had prepared outlining the discrimination, harassment, and hostility to which she had been subjected by the IRB.

80.   O'Neill read the letter and instructed the plaintiff "never send a letter like that and create problems."

81.   The plaintiff responded to O'Neill's command by telling him that it was important to inform Seemann about the discrimination, harassment, and hostility to which she had been subjected by the IRB, and to work on a solution by communicating with Seemann.

82.   O'Neill responded that "he wanted a simple solution and he wanted to get from point A-B quickly and without any problems for himself".

83.   O'Neill told the plaintiff that she was "too emotional," and then stated, "if you and Umekia [Taylor] send a letter like this you will destroy your careers."

84.   On August 13, 2013, the plaintiff again met with O'Neill, and Jeff Volek, Ph.D., R.D.

85.   Jeff Volek is a scientific advisory member of the NIFA grant, an obesity expert, and a DXA expert as well as being listed on the IRB protocol.

86.   The plaintiff once more complained about the disability discrimination, harassment, and hostility to which she was subjected by the IRB during the review of the grant protocol.

87.    The plaintiff renewed her desire to send Seemann the letter detailing the discrimination and harassment to which she had been subjected by the IRB.

88.   O'Neill, as he had previously stated, warned the plaintiff that submitting the letter would destroy her career.

89. Further threatening the plaintiff professional stature, O'Neill told the plaintiff that if she sent the letter to Seemann, "Seemann had the authority to remove her off the grant altogether."

90. When Jeff Volek suggested that he send the letter, O'Neill resorted to the same form of intimidation that he had employed with the plaintiff, and warned Jeff Volek that if he sent the letter, Jeff Volek "would have to fall on his sword."

91. Instead of addressing the plaintiff's complaints of disability discrimination, O'Neill chose to intimidate the plaintiff through threats of career destruction into silencing her.

92. On August 31, 2013, the plaintiff and Taylor resubmitted the protocol to the IRB for approval with a list of responses to the IRB's previous comments regarding the proposal.

93. The next IRB meeting was scheduled to take place on September 19, 2013.

94. As the revised protocol had been submitted by the plaintiff and Taylor to the IRB before the deadline of September 5, 2013, for items to be included on the next IRB meeting agenda, the revised protocol should have been reviewed by the IRB at its September 19, 2013 meeting.

95. On September 10, 2013, the plaintiff met with Taylor, Bonnie Burr (Assistant Director and Department Head, Department of Extension) and Michael P. O'Neill, Ph.D. (Associate Dean and Associate Director, Department of Extension) to prepare for the September 19, 2013, IRB meeting.

96.     During this meeting, Dr. O'Neill stated that the plaintiff should not attend the IRB

        meeting because she was "too emotional," and he was concerned that she might go

        into labor during the meeting and ruin the new furniture if her water broke.

97.     During this meeting, the plaintiff complained about the disability based

        discriminatory treatment to which she had been subjected by the IRB at its previous

        meetings.

98.     On September 18, 2013, the plaintiff contacted Douglas Bradway (IRB Program

        Associate) to confirm that the resubmission of the CT FANs IM protocol was on the

        agenda for the September 19, 2013, IRB meeting.

99.     Bradway responded that the protocol was not on the agenda because O'Neill had

        informed him that Taylor, unbeknownst to the plaintiff, was in the process of further

        revising the protocol to remove the DXA procedures and add a control group.

100.    Bradway advised the plaintiff that once those revisions were completed and

        submitted, the protocol would be reviewed by the IRB.

101.    The plaintiff then advised Wallach that it was troubling that the IRB was having

        unofficial exchanges with O'Neill with regard to the protocol and was making

        decisions without her knowledge because O'Neill was not a PI on the protocol and

        had previously admitted that he did not understand the research.

102.    The IRB bypassed the plaintiff in its discussions with O'Neill because it regarded her

        as being disabled on account of her learning disability, and because she had made her

        opposition to its disability discrimination known to O'Neill.

103.    Taylor, in consultation with Rineicha Otero ("Otero") (CT FANs IMProgram

        Administrator).and Lisa Kraimer-Rickaby ("Kraimer-Rickaby"), Ph.D. (Adjunct

Professor, Human Development and Family Studies, Torrington Campus), moved forward with making these revisions without the plaintiff's knowledge or input and submitted the revised protocol to the IRB on September 26, 2013.

104. On October 10, 2013, the IRB met to review the revised protocol.

105. The IRB approved the revised protocol on October 17,2013.

106. On October 29, 2013, the plaintiff received notification of the IRB's approval of the protocol, as well as documentation of the changes that had been made to the protocol.

107. The protocol had been completely changed without the plaintiff's input or approval, contrary to her position as a PI on the proposal.

108. The revised protocol, in reality, removed the plaintiff from the project because the research component had been eliminated from the project.

109. The revisions altered the protocol to such a degree that it no longer resembled the project that was described in the original grant application that was submitted to the USDA.

110. On November 1, 2013, the plaintiff met with Taylor, Otero and Kraimer-Rickaby regarding the revised protocol.

111. Taylor claimed that she chose not to consult with the plaintiff regarding these changes because the plaintiff had just given birth to a baby and Taylor supposedly wanted to respect the plaintiff's so-called family time.

112. The plaintiff's work with the Department of Kinesiology was gratuitous, but her work with the Department of Extension was a paid position that was funded by grants, the terms of which were documented in offer letters which she received each year since approximately 2006.

113.  During the IRB process, O'Neill advised the plaintiff that without IRB approval of the CT FANs IM protocol, there would be no money available to fund her salary.

114.  In September 2013, the plaintiff contacted Dr. O'Neill and Bonnie E. Burr ("Burr"), Assistant Director, Coop. Extension System, Head, Department of Extension, regarding the status of her expected offer letter, since the term of her last employment ended in August 2013.

115.  Neither O'Neill, nor Burr responded to the plaintiff's inquiry.

116.  O'Neill and Burr failed to respond to the plaintiff's inquiry about the annual renewal of her employment in retaliation for the plaintiff having voiced her concerns in a phone call to Dr. O'Neill, and in person on August 12, 2013, over the discriminatory manner in which she was being treated by the IRB because of her learning disability.

117.  In further retaliation against the plaintiff, Dr. O'Neill failed to submit the appropriate paperwork for the plaintiff's compensation in a timely manner, and as a result, she did not receive compensation from the defendant after August 2013.

118.  In November of 2013, after the plaintiff complained to Taylor about not being contacted about the scientific changes to the grant, Taylor asserted that she had not discussed the changes with the plaintiff because she just had a baby, and time was of the essence

119.  Significant changes were made to the grant application without any scientific basis or input from the plaintiff.

120.  Many of the changes inserted in the grant proposal were inaccurate and scientifically invalid.

121.   On December 23, 2013, the defendant presented an employment offer letter to the plaintiff which would have required the plaintiff to accept a demotion in her position, as well as her compensation.

122.   The offer letter presented to the plaintiff referred to her job title as a "Research Specialist" which, according to University rules, would not allow the plaintiff to be a co-PI on the project, or any other project.

123.   The plaintiff's previous title was "Assistant Research Professor," which enabled her to be a co-PI.

124.   The compensation listed in the offer letter of December 23, 2013, was reduced from $36,246.00, to $25,226.00.

125.   In addition, the offer letter characterized the plaintiff as an hourly employee, which was not her previous classification.

126.   Rejecting the demotion, the plaintiff refused to accept and sign the December 23, 2013, offer letter.

127.   On January 6, 2014, plaintiff met with Taylor, who had requested that she continue her involvement with the CT FANs IM project.

128.   On January 7, 2014, the plaintiff informed Taylor, Hamilton, Otero and Kraimer-Rickaby that she would not participate in the project in its current state because, with the arbitrary changes made to the protocol, the project was no longer scientifically sound.

129.   Taylor responded by telling the plaintiff that she was not required to participate in the project because she was not currently on the defendant's payroll.

130. Despite the discriminatory and retaliatory treatment directed at the plaintiff by the defendant, the plaintiff informed Taylor that she still desired to participate and advance the project.

131. The defendant presented to the plaintiff another offer letter dated January 15, 2014, which, other than changing her title back to Assistant Research Professor, and a term of employment for the period of February 1, 2014, through August 31, 2014, contained the same terms and compensation as the previous offer.

132. The plaintiff refused to accept the demotion, and rejected the January 15, 2014, offer letter.

133. In April 2014, Taylor told a peer colleague of the plaintiff, who Taylor was proposing as a replacement for the plaintiff on the grant proposal, that the plaintiff left the grant project because she had a baby and whenever there was more work to be done the plaintiff had more babies.

134. The defendant refused the plaintiff's repeated requests to have her appointment renewed so as to be able to work on the grant.

135. Other non-pregnant women had their appointments renewed and continued to work on the grant.

136. Other non-disabled women had their appointments renewed and continued to work on the grant.

137. Taylor confirmed to the plaintiff that at least two other non-pregnant, non-disabled women had been renewed and continued to work on the grant.

138. The plaintiff, however, was asked to work on other events and was not remunerated for her work.

17

139.    It was immediately after the plaintiff complained about being the subject of disability discrimination to O'Neill that O'Neill and Taylor bypassed her, and removed her from her leadership role in the grant protocol.

## VI.    FIRST CAUSE OF ACTION (Violation of the Rehabilitation Act)

140-278. The plaintiff incorporates as if re-alleged paragraphs 1 through 139.

279.    The plaintiff is a qualified individual with a disability within the meaning of the Rehabilitation Act, Title 29 U.S.C. § 794(a), in that the plaintiff is an individual with a disability who, with or without a reasonable accommodation, is capable of performing the essential functions of the position of Assistant Research Professor and Research Scientist.

280.    The defendant interfered with the plaintiff's efforts to obtain approval from the defendant for Protocol #Hl2-113: "Connecticut Fitness and Nutrition Clubs in Motion ("CT FANs IM"), resulting in the plaintiff's removal from participation in the grant proposal, as well as the non-extension of the plaintiff's appointment as Assistant Research Professor, Departments of Kinesiology and Extension.

281.    The interference by the defendant with the plaintiff's efforts to obtain approval from the defendant for Protocol #Hl2-113: "Connecticut Fitness and Nutrition Clubs in Motion ("CT FANs IM"), because she was afflicted with a learning disability, which resulted in the plaintiff's removal from participation in the grant proposal, as well as the non-extension of the plaintiff's appointment as Assistant Research Professor, Departments of Kinesiology and Extension are discriminatory actions prohibited by the Rehabilitation Act, Title 29 U.S.C. § 794.

282. As a result of suffering from a learning disability, the plaintiff is substantially limited in various of her major life activities, including learning, reading, concentrating, thinking, and communicating.

283. The plaintiff is an otherwise qualified individual with a disability within the meaning of the Rehabilitation Act.

284. The plaintiff is able and has performed the essential functions of the position of Assistant Research Professor, Departments of Kinesiology and Extension.

285. The defendant discriminated against the plaintiff solely on account of her disability with malice and with a reckless indifference to the federally protected rights of the plaintiff guaranteed to the plaintiff by the provisions of the Rehabilitation Act.

286. The defendant's interference with the plaintiff's efforts to obtain approval from the defendant for Protocol #Hl2-113: "Connecticut Fitness and Nutrition Clubs in Motion ("CT FANs IM"), because she was afflicted with a learning disability, which resulted in the plaintiff's removal from participation in the grant proposal, as well as the non-extension of the plaintiff's appointment as Assistant Research Professor, Departments of Kinesiology and Extension has caused, continues to cause and will cause the plaintiff to suffer substantial damages for future pecuniary losses, mental anguish, emotional stress, loss of enjoyment of life and other non-pecuniary losses.

287. The defendant's interference with the plaintiff's efforts to obtain approval from the defendant for Protocol #Hl2-113: "Connecticut Fitness and Nutrition Clubs in Motion ("CT FANs IM"), because she was afflicted with a learning disability, which resulted in the plaintiff's removal from participation in the grant proposal, as well as the non-extension of the plaintiff's appointment as Assistant Research Professor, Departments

of Kinesiology and Extension has caused, continues to cause and will cause plaintiff

irreparable harm through his loss of such gainful employment.

288.    There does not exist a legitimate, non-discriminatory reason that justified the

defendant's interference with the plaintiff's efforts to obtain approval from the

defendant for Protocol #Hl2-113: "Connecticut Fitness and Nutrition Clubs in Motion

("CT FANs IM"), because she was afflicted with a learning disability, which resulted

in the plaintiff's removal from participation in the grant proposal, as well as the non-

extension of the plaintiff's appointment as Assistant Research Professor, Departments

of Kinesiology and Extension.

289.    The plaintiff is an otherwise qualified individual with a disability who, with or

without a reasonable accommodation, would have been able to perform the essential

functions of the position of Assistant Research Professor, Departments of

Kinesiology and Extension.

290.    The defendant discriminated against the plaintiff on the basis of her learning

disability.

## VII.   SECOND CAUSE OF ACTION (UNLAWFUL RETALIATION IN VIOLATION OF THE REHABILITATION ACT)

291-428. The plaintiff incorporates as if re-alleged paragraphs 1 through 138.

429.    The defendant discriminated against the plaintiff on the basis of the plaintiff's

opposition to the defendant's unlawful disability discrimination when she voiced her

opposition to the defendant's disability discriminatory practices to which she had been

subjected by the defendant.

430.    Because the plaintiff's opposition to the defendant's disability discrimination was the determinative cause for the retaliatory actions to which the plaintiff was subjected by her supervisors, including O'Neill, the defendant violated the provisions of the Rehabilitation Act.

431.    Because the plaintiff's opposition to the defendant's disability discrimination was the cause for the retaliatory actions to which the plaintiff was subjected by her supervisor, including O'Neill, the defendant violated the provisions of the Rehabilitation Act.

432.    The defendant retaliated against the plaintiff by effectively removing her from participation in the grant proposal, as well as refusing to extend the plaintiff's appointment as Assistant Research Professor, Departments of Kinesiology and Extension.

433.    The defendant engaged in retaliation against the plaintiff with malice or reckless indifference to the plaintiff's rights under the Rehabilitation Act.

434.    As a result of the unlawful retaliation, the plaintiff has suffered emotional distress.

435.    As a result of the unlawful retaliation, the plaintiff has suffered financial losses.

VIII.  **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, THE PLAINTIFF PRAYS THAT THIS COURT:

As to the First Cause of Action and the Second Cause of Action

    a.  declare the conduct engaged by the defendant to be a violation of the plaintiff's rights guaranteed to her by the Rehabilitation Act;

b.  enjoin the defendant from engaging in such conduct;

c.  award the plaintiff equitable relief in the form of back salary and fringe benefits, plus interest as allowed by law until paid in full, together with front salary and benefits accrual;

d.  award the plaintiff compensatory and punitive damages;

e.  award the plaintiff costs and attorney fees; and

f.  grant such other and further relief as the Court may deem just and proper.

## IX.  **JURY DEMAND**

**THE PLAINTIFF REQUESTS A TRIAL BY JURY**.

THE PLAINTIFF – ANA LOURDES VOLEK


BY _/s/ Thomas W. Bucci
Thomas W. Bucci
Fed. Bar #ct07805
WILLINGER, WILLINGER & BUCCI, P.C.
855 Main Street
Bridgeport, CT  06604
Tel: (203) 366-3939
Fax: (203) 337-4588
Email: thomasbucci@earthlink.net